**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

TERESA ROBERTS, COLLEEN
SANDERS and DEANNA SCHLISKE,

Plaintiffs,

vs.

USCC PAYROLL CORPORATION and
BONNIE HRUSKA,

Defendants.

No. C07-3071-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

*I.* *INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . 13

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   *A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . 14
   *B. Federal and Iowa law claims* . . . . . . . . . . . . . . . . . . . . . . . 21
   *C. Plaintiffs' Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      *1. The circumstantial evidence paradigm* . . . . . . . . . . . . . . . . . . 23
      *2. Prima facie case of age discrimination* . . . . . . . . . . . . . . . 25
      *3. Analysis—plaintiffs' showing of pretext* . . . . . . . . . . . . . 28
         *a. Violation of policy by younger workers* . . . . . . . . . . 30
         *b. Enforcement of post-April 19th violations* . . . . . . . . 31
         *c. Hood's comments* . . . . . . . . . . . . . . . . . . . . . 34
   *D. Constitutionality Of Summary Judgment* . . . . . . . . . . . . . . . . . 36

*III.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

This case arises from defendant USCC Payroll Corporation's ("USCC") termination of plaintiffs' employment based on what USCC asserts was a violation of a company rule. USCC contends that plaintiffs were fired for violating a rule prohibiting employees from working on the accounts of friends and family. Plaintiffs allege that the real reason behind their dismissals was their ages, and that USCC's explanation is a mere pretext.

## I. INTRODUCTION AND BACKGROUND

### A. Factual Background

The summary judgment record reveals that the following facts are undisputed. USCC is in the business of selling cellular telephones and cellular telephone services. Plaintiffs Teresa Roberts, Colleen Sanders and Deana Schliske (collectively, "Plaintiffs") worked for USCC as Retail Wireless Consultants ("RWC") throughout their employment. Roberts was hired in February 1999, Sanders in October 2000, and Schliske in February 2003. In 2005, plaintiffs all worked in USCC's Fort Dodge store. In addition to plaintiffs, in September 2005, Debbie Garrett, Jackie Knierem, Roni McColley, Tiffany Sorenson and Julie Zehr were all RWCs at USCC's Fort Dodge store. As RWCs, plaintiffs were responsible for providing general customer service, including selling cellular telephones and USCC cellular telephone services, answering questions and billing inquiries and accepting payments. Plaintiffs were also responsible for completing accurate paperwork and transactions according to company policies and procedures.

Commencing in May 2005, plaintiffs reported directly to Stephanie Hood, who was the sales manager at the Fort Dodge store. Hood reported to Bonnie Hruska, the store manager. RWCs could go to Hruska for clarification of company policies. Hruska was able to observe the interaction between associates and their customers, and could also overhear their conversations.

In addition to the Fort Dodge store, Hruska was the store manager for USCC's Mason City store. As a result, Hruska was only in the Fort Dodge store one to two days per week, for approximately seven hours each day. Hood interacted with Hruska on a daily basis via telephone, email, or in person. Hruska, in turn, reported to Jody Duke, area sales manager. Duke became the area sales manager on June 1, 2005. She supervised ten to twelve locations, including the Fort Dodge store. Five or six store managers reported to Duke. Duke was not involved in the training of front line sales associates. Approximately 100 employees were in Duke's chain of command in 2005.

The day-to-day assessment of a sales associate, such as their sales numbers and progressive discipline before final warning, was part of the store manager's responsibilities. The sales manager and store manager had more personal, detailed knowledge regarding the performance of sales associates in their store than Duke.

As the area sales manager, Duke, along with human resources, would make the final decision as to whether an associate in her region would be terminated. Christine Verstegen, associate relations manager, provided human resources support in Iowa, including at the Fort Dodge store.

Duke's office was located in Urbandale, Iowa. As such, plaintiffs had very few and, in some cases, no interactions with Duke prior to their terminations. Verstegen's office was located in Cedar Rapids, Iowa. Verstegen visited the Fort Dodge store twice in 2005 and met each of the plaintiffs.

As RWCs, plaintiffs were required to comply with USCC's policies and procedures. Plaintiffs understood that they could be disciplined or terminated for not complying with USCC's policies and procedures. In June 2002, plaintiffs received an updated copy of USCC's Associate Handbook and acknowledged that they read and understood the policies. USCC's Associate Handbook contains an intranet policy informing associates that "U.S.

Cellular's intranet site provides associates with important company information, such as policies and procedures, associates benefit information and commonly used forms, at the click of a mouse." Associate Handbook at 35, Defendants' App. at 206. USCC's Associate Handbook also informs associates that Dynamically Speaking "is a weekly, on-line company newsletter available to all U.S. Cellular associates. Dynamically Speaking is available on the USCC's Intranet site and provides company and industry related news and information." Associate Handbook at 35, Defendants' App. at 206. Plaintiffs were aware that the policies and procedures that applied to their employment with USCC were available on the company's intranet site. On occasion it was not possible to access the company's intranet site. Sanders never reviewed policies online and was unaware of how to do so. She never attempted to access the company's policies on-line and never asked anyone how to do it.

USCC's Associate Handbook also references USCC's Associate Phone Program Policies, which are available on-line to all associates. All three plaintiffs took advantage of the Associate Phone Program during their employment with USCC. The Associate Phone Program Policies contain a specific Friend and Family policy, which states that "associates are not authorized to access, view or make changes to accounts belonging to friends and family and are also subject to disciplinary action up to and including termination if discovered." Associate Phone Program Policies at 8, Defendants' App. at 231. The Friends and Family policy has been in place at USCC since at least 1995. The Associate Phone Policy does not define either the term "friend" or "family."

On November 8, 2000, Sanders signed an interoffice memorandum that referenced the Associate Phone Program Policies, known as HR policy 401-4. The interoffice memorandum stated:

Just a reminder for the demo/personal employee
accounts.

Employees of U.S. Cellular are not allowed to make
changes to their personal and/or demo accounts. Changes
include but are not limited to SN changes, price plans, features
and any other actions that would require using CARES.

The designated plan administrator for the market,
myself, must do all changes on demo accounts. Another
employee must process payments when made on demo
accounts.

The employee cannot change personal accounts
themselves as well, along with the same policy as demo
accounts.

Changes made to personal and/or demo accounts by the
employee will result in disciplinary action or termination per
the code of conduct handbook guidelines. These are found in
the HR handbook policy 401-4(a) and page 62 of the employee
handbook.

Interoffice Mem. at 1, Defendants' App. at 281. Roberts has no reason to believe that she
did not receive this same interoffice memorandum.

Schliske received a copy of the Friends and Family policy, as of February 2003.
Schliske and the other plaintiffs, however, do not recall receiving a hard copy of the
Associate Phone Program Policies prior to September 2005. The Friends and Family
policy was discussed in the April 19, 2005, edition of "Dynamically Speaking", USCC's
newsletter. This edition of Dynamically Speaking was e-mailed to each of the plaintiffs.

The Fort Dodge store had monthly employee meetings. The Friends and Family
policy was never discussed at any monthly employee meeting. Renita Shanahan, the prior
manager of the Fort Dodge store, told associates that they could work on an account as
long as the person was not a family member who lived with you.

In reference to different preferences among the employees regarding the temperature for the store, Sanders heard Hood say, "We shouldn't have to suffer for the old ones in here." Sorenson also overheard Hood's comment but thought Hood stated, "Just because you older ladies are hot, don't [sic] mean that us younger people have to suffer." Sanders later told Schliske about Hood's comment. On another occasion, when Hood was sitting at Sanders' desk, Sanders heard Hood comment that the Fort Dodge store's full-time staff was made up entirely of women and then state, "We need a young black man in here." Julie Zehr, another RWC in the Fort Dodge store, told Roberts about Hood's comment. On another occasion, Sanders heard Hood state that "Change is good. No one needs to stay around here all the time."

In her performance evaluation for 2003, Schliske received an overall rating of "P.M." or "Partially Meets Expectations." Schliske again received an overall rating of "P.M." or "Partially Meets Expectations" in her performance evaluation for 2004. As a result, Schliske was placed on a Performance Improvement Plan by a former supervisor at USCC. Termination was an option if Schliske did not successfully complete her Performance Improvement Plan. Schliske thought that both Hood and Hruska supported her efforts to successfully complete her Performance Improvement Plan, and later determined that she had successfully completed her Performance Improvement Plan. On August 5, 2005, Hood provided Schliske with a performance evaluation with an overall rating of "ME" or "Meets Expectations." This was the first time during her employment with USCC that Schliske had received an overall rating of "ME" or "Meets Expectations."

In April 2005, Roberts failed to meet her quota for her RWC position. She also failed to meet her quota again in June and July 2005. Roberts understood that she could be terminated if she failed to meet quota three times within a rolling twelve month period under USCC's Sales Productivity and Accountability Plan. Verstegen did not believe it

was fair to hold Roberts accountable for her failure to meet quota in April 2005 based on a late disclosure. As a result, Roberts was not terminated but placed on a Performance Improvement Plan by Hood. Roberts successfully completed the Performance Improvement Plan. On August 5, 2005, Hood provided Roberts with a Performance Evaluation in which Hood indicated that Roberts was meeting expectations. Hood found Roberts to be a very hard worker and a solid employee. Hruska thought Roberts was a good employee.

On April 26, 2005, Sanders accessed, viewed and made changes to an account of a family member when she ran credit and activated a line of service for her son, Troy. On May 19, 2005, Sanders again accessed, viewed and made changes to Troy's account when she adjusted a wrong charge. On September 14, 2005, Sanders accessed, viewed and made changes to her son Byron's account when she ran credit for that account.

On May 7, 2005, Schliske accessed, viewed and made changes to an account of a family member when she added nights and weekends minutes to her cousin's account. On July 1, 2005, Schliske again accessed her cousin's account when she reprinted a bill for that account.

On May 23, 2005, Roberts accessed, viewed and made changes to an account of a family member when she added text messaging to her nephew's account. On May 27, Roberts again accessed, viewed and made changes to an account of a family member when she added nights and weekends minutes to her nephew's account.

On August 13, 2005, Hood provided Sanders with a Performance Evaluation in which Hood indicated that Sanders was meeting expectations. Sanders thought Hood viewed her as an asset to the company and Hood never had anything negative to say about Sanders's performance at USCC. Sanders also thought that Hruska was supportive of her employment at USCC. Hruska thought Sanders was a good employee.

There was considerable confusion about the Friends and Family policy in USCC's Fort Dodge store. In response, on September 9, 2005, Hruska sent, via e-mail, plaintiffs a copy of the Associate Phone Program Policies and the April 19, 2005, edition of Dynamically Speaking. In the accompanying text, Hruska wrote:

> Through the state there has been some confusion on what you can and cannot do on family and friends accounts. Please look over the attached documents and let me know if you have any questions. Thank you, this e-mail is being sent on a Friday due to it's [sic] urgency.

Hruska e-mail at 1, Defendants' App. at 251. After receiving Hruska's e-mail, employees in the Fort Dodge store talked about the Friends and Family policy but none of the plaintiffs disclosed to management that a violation.

On September 26, 2005, Schliske's cousin came into Fort Dodge's USCC store with a question about insurance. Schliske approached Hruska with her cousin's question and disclosed that the customer was Schliske's cousin. Schliske did nothing to hide the fact that the person was her cousin. Hruska later confirmed with Schliske that the customer she was helping was her cousin. Hruska informed Duke about the exchange between her and Schliske. Duke then investigated whether Schliske had accessed, viewed and/or made changes to her cousin's account. At Duke's request, Hruska provided Duke and Verstegen with a list of transactions performed by Schliske on her cousin's account. A log-on identification number identifies which RWC worked on an account. Duke then contacted Verstegen to discuss the information. It was ultimately decided by Duke and Verstegen that associates should be held accountable for any violation of the Friends and Family policy that occurred after the April 19, 2005, issue of Dynamically Speaking was transmitted because that was the last clear communication from USCC regarding the policy.

On September 27, 2005, Hruska informed Schliske that she was being terminated for violating the Friends and Family policy. Duke was present at the time of Schliske's termination. During the termination meeting, Schliske told Duke that, "I guess I was stupid and shouldn't have mentioned" the fact that the customer was her cousin. Schliske has personally seen other employees in the Fort Dodge store, including Hood, Garrett, Knierem, McColley and Zehr violate the Friends and Family policy. Schliske also told Hruska and Duke that everybody at the Fort Dodge store, including Sanders and Roberts, had violated the Friends and Family policy. Schliske was 47 years old at the time of her termination. She is unaware of any statement made by either Duke or Verstegen that would indicate that they are prejudiced. After Schliske was fired, Sorenson went to Hruska and told her that it was unfair to fire her because the employees were not made aware of the policy and that everyone in the store had done it. Shortly after Schliske was fired, Knierem told Sanders that she was worried about losing her job for violating the policy. Knierem worked on the accounts of Neil and Janeen Hungate, the parents of her boyfriend.

Duke immediately investigated Schliske's allegations that other employees, including Sanders and Roberts, had violated the Family and Friends policy. She did so using USCC's CARES system to determine whether any other associate in the Fort Dodge store, including Sanders and Roberts, had violated the Friends and Family policy. Hruska and Hood were involved in the research to determine which employees had violated the policy. Hruska cannot recall if she ever looked into whether Garrett or Knierem had violated the Friends and Family policy. At Duke's request, Hruska provided information to Duke from CARES. Duke independently verified that the information she received from Hruska was true and accurate. Duke also had face to face interviews with all of the associates of the Fort Dodge store and followed up on the information that was provided

to her during the interviews. Duke did not consult with Hruska or Hood about the work ethic, credibility, honesty or integrity of any employee at the Fort Dodge store.

During the investigation, Knierem came forward and provided Hruska with information that Sanders had run credit on one of her son's accounts. On October 3, 2005, Hruska met with Sanders and asked her if she had worked on her children's accounts. Sanders replied that she had. Hruska then asked Sanders if she understood that this was against company policy. Sanders responded that she had not known that at the time. When Hruska informed Sanders that she could be fired for such a violation, Sanders replied, "Well, then you're going to have to fire everybody because we've all done it." Based on information uncovered during the investigation that Sanders had accessed, viewed, and/or made changes to her sons' accounts after the April 19, 2005, issue of Dynamically Speaking was distributed, Sanders was told that she was being terminated for violating the Friends and Family policy. Sanders asked Hruska to suspend her, rather than terminate her employment, because the Friends and Family policy provided for discipline up to and including termination. Hruska in turn asked Verstegen if there were any possible alternatives to termination for Sanders. Verstegen told Hruska that they would proceed with Sanders's termination. On October 6, 2005, Hruska informed Sanders that she was being terminated for violating USCC's Friends and Family policy at the direction of Duke and Verstegen. Hood was also present at the October 6, 2005, termination meeting. Hood tried to help Sanders find another job by telling her about a job opening. Sanders was 50 years old at the time of her termination. Sanders is not aware of any statement made by either Duke or Verstegen that would indicate that they are prejudiced in any way.

During the investigation, McColley admitted to Duke that she had accessed her brother-in-law's account. Duke's investigation revealed that McColley's brother-in-law's account had been closed for so many years that Duke could not even determine that

McColley had accessed the account. Garrett admitted to Duke that she had accessed her ex-husband's account.

On October 6, 2005, Hood, in response to employees at the Fort Dodge store asking her about who constituted a friend or family member, sent out an e-mail to all RWCs in the Fort Dodge store reiterating the Friends and Family policy. The text of Hood's e-mail reads in pertinent part as follows:

> I know many of you have asked me what constitutes a friend and/or family member. . .my response is if you have to think twice about helping a customer in accordance with this policy, hand it off to another associate. Now I know that this still leaves room for interpretation and so I am providing Chris Verstegen's (HR) number so that you can call her with questions as well.

Hood e-mail at 1, Defendants' App. at 279 (ellipsis in original).

Roberts did not go to anyone in management to disclose that she had violated the Friends and Family policy. During Roberts's interview with Duke, in response to a question from Duke asking if she had violated the Friends and Family policy, Roberts told Duke that she had worked on her nephew's account. Afterward, Duke, along with Verstegen, made the decision to terminate Roberts based on her activity on her nephew's account. On November 1, 2005, during a meeting with Hood and Hruska, Hruska told Roberts that she was terminated for violating USCC's Friends and Family policy. During the termination meeting, Roberts again confirmed that she had worked on her nephew's account. Roberts was 53 years old at the time of her termination. Roberts is not aware of any statement made by either Duke or Verstegen that would indicate that they are prejudiced in any way.

During her investigation, Duke also discovered that another RWC in the Fort Dodge store, Tiffany Sorenson, had violated the Friends and Family policy. Sorenson told

11

Hruska that she was unaware of the policy and that every person in the Fort Dodge store worked on the accounts of friends and family members. Sorenson told Duke that she had worked on her sister's accounts. On November 1, 2005, Sorenson was informed that she was also being terminated for violating USCC's Friends and Family policy. Duke, along with Verstegen, made the decision to terminate Sorenson. Neither Duke or Verstegen sought any input from Hood or Hruska in connection with the decision to terminate Sorenson. Sorenson was 35 years old when she was terminated. Sorenson is Roberts's sister-in-law.

While she was employed by USCC in Iowa, Verstegen became aware of violations of the Friends and Family policy by twenty RWCs throughout Iowa. All twenty RWCs who violated the Friends and Family policy were terminated. None of the terminations were for conduct occurring prior to April 2005. Of the twenty RWCs terminated for violating the Friends and Family policy, eleven, other than plaintiffs and Sorenson, were terminated in 2005 alone. Duke was involved in the decision to terminate three RWCs in addition to plaintiffs and Sorenson. These three RWCs were in their twenties or early thirties.

On October 4, 2005, after she was terminated, Schliske filed a voluntary Chapter 7 petition for bankruptcy protection with the United States Bankruptcy Court for the Southern District of Iowa. Schliske originally planned to file for bankruptcy protection under Chapter 13, but converted it into a Chapter 7 filing after her termination. Schliske did not list her claim against USCC as an asset in her bankruptcy schedules. Schliske's bankruptcy was discharged as a no asset discharge on January 10, 2006.

## B. *Procedural Background*

On October 15, 2007, plaintiffs Teresa Roberts, Colleen Sanders and Deanna Schliske filed their complaint in this case against defendants USCC Payroll Corporation, and Bonnie Hruska. On March 4, 2008, plaintiffs amended their complaint in order to correct a misnomer of defendant USCC. In their amended complaint, plaintiffs allege the following two causes of action against their former employer, defendant USCC and supervisor, defendant Bonnie Hruska: (1) claims of age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and (2) pendent state law claims under the Iowa Civil Rights Act ("ICRA") for age discrimination, IOWA CODE CH. 216.

Defendants have filed a Motion for Summary Judgment on all of plaintiffs' claims. In their motion, defendants assert that plaintiffs cannot establish a *prima facie* case of age discrimination because they were not meeting USCC's legitimate job expectations when they violated a USCC policy, prohibiting employees from working on the accounts of friends and family. Defendants also assert that plaintiffs cannot establish a *prima facie* case of age discrimination because they cannot show that they were replaced by younger workers. Defendants further argue that even if plaintiffs can establish a *prima facie* case of age discrimination, defendants can demonstrate a legitimate, nondiscriminatory reason for plaintiffs' termination, namely that they each violated USCC's policy prohibiting employees from working on the accounts of friends and family. Defendants also argue that plaintiffs cannot establish that their stated reason for USCC's terminating them—their violation of USCC's Friends and Family policy—was a pretext for discrimination. Defendants further assert that they are entitled to summary judgment against plaintiff Schliske on the grounds that her claims are barred under the doctrine of judicial estoppel.

Defendants contend that plaintiff Schliske failed to disclose her claims against them to the United States Bankruptcy Court for the Southern District of Iowa at any time during the pendency of her prior Chapter 7 bankruptcy proceeding in that court even though she was under an affirmative duty to do so. Plaintiffs have filed a timely resistance to defendants' Motion for Summary Judgment, contesting each of the grounds for summary judgment put forward by defendants and arguing that there are genuine issues of material fact in dispute which preclude the granting of summary judgment on their claims. Plaintiffs further argue that the granting of summary judgment is an unconstitutional violation of the Seventh Amendment to the United States Constitution. Plaintiff Schliske also argues that defendants cannot establish the three requisite factors for application of judicial estoppel against her. Alternatively, plaintiff Schliske contends that her failure to disclose her claims in bankruptcy were the result of a good faith mistake, and therefore, the doctrine of judicial estoppel is inapplicable. Defendants have filed a timely reply brief.

## II.  LEGAL ANALYSIS

### A.  Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for

summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a

genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment;

rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

The court recognizes "that summary judgment is disfavored in employment discrimination cases." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005); *see Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004) ("[S]ummary judgment should be used sparingly in employment discrimination cases . . . ."); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("[S]ummary judgment should seldom be used in employment discrimination cases."). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing

*Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson*, 425 F.3d at 542 (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The court will apply these standards to the defendants' Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—nearly forty years after the passage of the ADEA—than during ADEA's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory

19

intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII). This court's experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

### B.  Federal and Iowa law claims

Before addressing the merits of the parties' respective arguments, it is important to note, again, that plaintiffs have brought their claims of age discrimination under both federal law, pursuant to the ADEA, and state law, pursuant to the ICRA.  This court has previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA."  *Soto v. John Morrell & Co.*, 285 F. Supp.2d 1146, 1177-78 (N.D. Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)); *see King v. United States*, 553 F.3d 1156, 1160 n.3 (8th Cir. 2009) (noting that "[b]ecause the same analysis applies to age discrimination claims under the ADEA and the ICRA," the court need not discuss plaintiff's claims under ICRA); *Christensen v. Titan Distribution, Inc.,* 481 F.3d 1085, 1095 n.4 (8th Cir. 2007) (same); *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n.2 (8th Cir. 2000) ("The ICRA is interpreted to mirror federal law, including the ADEA") (citing *Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999)).  This is so, because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA.  *See Soto*, 285 F. Supp.2d at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), which states, "The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides an analytical framework for analyzing ICRA claims.  *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between the ADEA and the ICRA becomes critical, the court will analyze plaintiffs' state and federal age discrimination claims together using federal precedent.

## C. Plaintiffs' Claims

Under the ADEA, it is unlawful for an employer to "fail to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1); *see Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2347 (2009); *King*, 553 F.3d at 1160. "A plaintiff may establish her claim of intentional age discrimination through either direct evidence or indirect evidence." *Id.*; *see Ward v. Int'l Paper Co.,* 509 F.3d 457, 460 (8th Cir. 2007); *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1127 (8th Cir. 1999). Each of these types of ADEA claims has slightly different elements. *Spencer*, 173 F.3d at 1127 (citing *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 609 n.1 (8th Cir. 1997)). Here, plaintiffs have not provided direct evidence of discrimination, therefore, their ADEA claims, based on circumstantial evidence, are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).[1] *See King*, 553 F.3d at 1160; *Loeb v. Best Buy, Inc.*, 537 F.3d 867, 872 (8th Cir. 2008); *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 871 (8th Cir. 2008); *Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008); *Morgan v. A.G. Edwards & Sons, Inc.,* 486 F.3d 1034, 1042 (8th Cir. 2007); *Breeding*

---

[1] "'Direct evidence is that which demonstrates a specific link between the challenged employment action and the alleged animus.'" *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th cir. 2001) (quoting *Kells v. Sinclair Buick-GMC Truck, Inc.,* 210 F.3d 827, 835 (8th Cir. 2000)); *see Browning v. President Riverboat Casino-Mo., Inc.*, 139 F.3d 631, 634 (8th Cir. 1998) ("'Direct evidence'" has been interpreted as "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision.") (quoting *Thomas v. First Nat'l Bank*, 111 F.3d 64, 66 (8th Cir. 1997), which in turn quotes *Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1282 (8th Cir. 1995)).

*v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999).[2]  The parties hotly dispute, however, whether the record generates a genuine issue of material fact as to circumstantial evidence of age discrimination under the *McDonnell Douglas* burden-shifting analysis.  Therefore, the court will first set forth the circumstantial evidence paradigm, followed by an analysis and resolution of defendants' Motion for Summary Judgment.

### 1.    The circumstantial evidence paradigm

Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *Tuttle v. Missouri Dept. of Agriculture*, 172 F.3d 1025, 1029 (8th Cir. 1999); *White v. McDonnell Douglas Corp.*, 985 F.2d 434, 435 (8th Cir. 1993).  The importance of the *prima facie* showing is that it creates the inference that the employer terminated the plaintiff for an impermissible reason.  *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995).   As to the first stage of the *McDonnell Douglas* burden-shifting analysis, the Eighth Circuit Court of Appeals has explained,

> To make such a [*prima facie*] case under the ADEA, the plaintiff must ordinarily show that:  (1) he is a member of a protected age group; (2) he was performing his job at a level

_____

[2]In its recent decision in *Gross*, the United States Supreme Court noted that:  "the Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context."  *Gross*, 129 S. Ct. at 2349 n. 2.  Because the Eighth Circuit Court of Appeals has and given the absence of any further direction from the Supreme Court, this court must follow controlling Eighth Circuit precedent, which applies the *McDonnell Douglas* framework to indirect evidence of discrimination ADEA claims. *See King*, 553 F.3d at 1160; *Loeb*, 537 F.3d at 872; *Fitzgerald*, 521 F.3d at 871; *Morgan,* 486 F.3d at 1042; *Breeding*, 164 F.3d at 1156.

that met his employer's legitimate expectations; (3) he was discharged; and (4) he was replaced by a *younger* worker.

*Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004) (emphasis added); *accord* Loeb, 537 F.3d at 872; *see Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 642 (8th Cir. 2008) ("[A] plaintiff can establish a prima facie case of age discrimination if he can show that (1) he was at least forty years old; (2) he was terminated; (3) he was meeting his employer's reasonable expectations at the time of his termination; and (4) he was replaced by someone substantially younger."); *Mayer v. Nextel West Corp.,* 318 F.3d 803, 806-07 (8th Cir. 2003) (same); *cf. Erenberg v. Methodist Hosp.*, 357 F.3d 787, 793 (8th Cir. 2004) ("'In order to establish a prima facie case of age discrimination, the Plaintiff must show that she "(1) is a member of the protected class; (2) was qualified for the position from which [s]he was demoted or discharged; and (3) was replaced by another person.'") (quoting *Rothmeier v. Inv. Advisers, Inc.*, 932 F. Supp. 1156, 1159 (D. Minn. 1996), in turn citing *McDonnell Douglas*, 411 U.S. at 802). "Once established, the prima facie case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir. 1995); *accord Tuttle*, 172 F.3d at 1029; *Krenik v. County of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995); *Kobrin v. University of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994).

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *Tuttle*, 172 F.3d at 1029; *White*, 985 F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981), but the employer's burden of production has nonetheless been held to be "exceedingly light."

*Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir. 1994) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)).   If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against plaintiffs.  *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *Tuttle*, 172 F.3d at 1029; *United States v. Johnson*, 28 F.3d 1487, 1494 (8th Cir. 1994), *cert. denied*, 513 U.S. 1098 (1995).   However, if the defendants' proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's*, 509 U.S. at 510. ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

### 2. *Prima facie case of age discrimination*

 Defendants concede that plaintiffs  can establish the first and third elements of their *prima facie* case, but contend that plaintiffs cannot establish a *prima facie* case of age discrimination here because they cannot make out the necessary showing that they were meeting USCC's legitimate job expectations or that they were replaced by younger workers.  Plaintiffs contest both of these assertions.

The parties dispute whether plaintiffs were meeting USCC's legitimate job expectations for their positions.  Defendants assert that plaintiffs were not meeting its legitimate expectations because they violated the company's Friends and Family policy

which prohibited employees from working on the accounts of their friends and family. Plaintiffs counter that evidence of their positive performance evaluations is sufficient to meet this prong of the analysis. Plaintiffs also argue that a genuine issue of material fact has been generated with respect to whether they were meeting USCC's expectations as a result of the non-firing of younger associates who also allegedly violated USCC's Friends and Family policy. Plaintiffs contend that this demonstrates that an employee's violation of the company's Friends and Family policy does not necessarily equate to a failure to meet USCC's legitimate job expectations.

The Eighth Circuit Court of Appeals has instructed that at the *prima facie* case stage the question is not whether the plaintiff performed to the employer's expectations but whether he was "otherwise qualified for the position he held." *Riley*, 518 F.3d at 1000 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000)). "Under the qualification prong, a 'plaintiff must show only that he possesses the basic skills necessary for the performance of the job,' not that he was doing it satisfactorily." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 n. 2 (8th Cir. 2007) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)). The court of appeals reasoned that requiring any greater showing would "collapse[ ] the prima facie case into the *McDonnell Douglas* framework" and be in error. *Riley*, 518 F.3d at 1000; *see McGinnis*, 496 F.3d at 874 n.2. Applying the *Riley-McGinnis* criterion in this case, plaintiffs easily meet their burden of establishing this stage of the *prima facie* case based on their multi-year work history at USCC. *See Riley*, 518 F.3d at 1000 ("Since he had been performing the DAM job successfully for years, he met the requirement of the prima facie case."); *McGinnis*, 496 F.3d at 875-76 (holding that plaintiff was otherwise qualified for position where he had worked for defendant employer "for approximately twenty-eight years"). At the time of plaintiffs' terminations, Roberts had worked for USCC for over six years, Sanders for five

years and Schliske for over two and one-half years in the same positions from which they were terminated. Accordingly, plaintiffs have met the second prong of their *prima facie* case.

Defendants also argue that plaintiffs cannot meet the fourth prong of the *prima facie* case, that they were replaced by younger workers. *See Loeb*, 537 F.3d at 872; *Hitt*, 356 F.3d at 924. It is undisputed that after Schliske was terminated, at the age of 47, her job duties were absorbed by the remaining full-time RWCs in the Fort Dodge store, which included plaintiffs Roberts and Sanders, who were both older than Schliske, along with Ronette McColley, who at the age of 45, was not substantially younger than Schliske, Debra Garrett, 29 years old, Julie Zehr, 31 years old, and Tiffany Sorenson, age 35. Likewise, when Sanders was fired, at age 50, her duties were assumed by those remaining full-time RWCs in the Fort Dodge store, which again included Roberts, who was older than Sanders, McColley, Garrett, Zehr, and Sorenson, age 35. Finally, when Roberts was fired, her duties were again absorbed by the remaining full-time RWCs in the Fort Dodge office, McColley, Garrett, and Zehr.[3] Where, as here, plaintiffs' responsibilities were not reassigned to specific individuals, the Eighth Circuit Court of Appeals has instructed that "the plaintiff must satisfy the fourth element of the *prima facie* case by showing "'age was a factor in the employer's decision to terminate.'" *Hitt*, 356 F.3d at 924 (quoting *Yates v. Rexton, Inc.*, 267 F.3d 793, 799 (8th Cir. 2001)). Plaintiffs claim that USCC's hiring of four individuals under the age of 30 to be RWCs in the Fort Dodge store meets this requirement. This assertion, however, misstates the record. The only full-time RWCs that were hired or transferred into the Fort Dodge store before Hruska transferred out in November 2006, were Sherry Hale, who was 50 years old in the fall of 2005, and Travis

[3]Sorenson was fired the same day as Roberts.

Beckman, who was 22 years old in the fall of 2005. Beckman was terminated shortly after he was hired. Because Hale was the same age as one of the plaintiffs or older than another, her hiring does not give rise to any inference that age was a factor in USCC's decision to terminate plaintiffs. Moreover, although USCC did hire three other employees under the age of 30, Steven Kramer-Garrett, Shanda Stumpf and Linda Griggs, for the Fort Dodge store, plaintiffs have not offered any evidence as to when, after plaintiffs' terminations, these individuals were hired, what duties they assumed, and whether they were hired on a full-time or part-time basis.[4] Given this lack of information concerning these employees, the court cannot conclude that plaintiffs have satisfied the fourth element of the *prima facie* case by showing that "'age was a factor in the employer's decision to terminate.'" *Hitt*, 356 F.3d at 924 (quoting *Yates,* 267 F.3d at 799). Therefore, because the court concludes that plaintiffs have not made out their *prima facie* case of age discrimination under the ADEA and the ICRA, defendants' Motion for Summary Judgment on all of plaintiffs' claims is granted.

### 3. *Analysis—plaintiffs' showing of pretext*

Even if the court were to assume, *arguendo,* that plaintiffs had established a *prima facie* case of age discrimination, their age discrimination claims fail, because they have not generated a genuine issue of material fact that the reasons defendants proffered for terminating them were pretextual.[5] A plaintiff "can avoid summary judgment if the

---

[4]In addition to these three individuals, USCC also hired Katie Underberg and Stacey Hansch. When Underberg and Hansch were hired and their ages do not appear in the summary judgment record.

[5]If plaintiffs had established a *prima facie* case of age discrimination, the burden of production, not proof, would shift to defendants to rebut the presumption of discrimination with a nondiscriminatory explanation for termination. *McDonnell Douglas*,

(continued...)

evidence creates (1) a fact issue as to whether [the defendant's] proffered reason is pretextual and (2) a reasonable inference that age was a determinative factor in his termination." *Carraher v. Target Corp.*, 503 F.3d 714, 717 (8th Cir. 2007); *see Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 898 (8th Cir. 2004) (instructing that the showing of pretext necessary to survive summary judgment "requires more than merely discrediting [defendants'] proffered reason for the adverse employment decision. [Plaintiffs] must also prove that the proffered reason was a pretext for age discrimination.") (quoting *Sprenger*, 173 F.3d at 1128); *see Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (noting that to create a factual issue on pretext "the ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff].'") (quoting *Feltmann v. Sieban*, 108 F.3d 970, 975 (8th Cir. 1997)). In order to accomplish this, a plaintiff must present some evidence beyond the evidence put forth in step four of his *prima facie* case. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's

---

[5](...continued)
411 U.S. at 802. This is a burden of production, not of persuasion. *Reeves*, 530 U.S. at 143; *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 981 (8th Cir. 2001). Defendant must produce admissible evidence that supports its nondiscriminatory reason for termination. *Reeves*, 530 U.S. at 143. If the defendant employer is able to rebut the presumption, the presumption disappears, and "the sole remaining issue is discrimination vel non." *Reeves*, 530 U.S. at 143. Here, defendants assert that plaintiffs were each terminated because they violated USCC's Friends and Family policy after the policy was discussed in the April 19, 2005, edition of "Dynamically Speaking," USCC's newsletter which was e-mailed to each of the plaintiffs. Indeed, plaintiffs concede that they each violated this policy. Therefore, defendants' proffered reason for their termination is legitimate and non-discriminatory.

asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 147-48.

Plaintiffs contend that the following evidence shows pretext: (1) two other RWCs in the Fort Dodge store, who were younger than plaintiffs, were not terminated for violating USCC's Friends and Family Policy; (2) holding associates accountable only for violations of the Friends and Family policy that occurred after April 19, 2005;and (3) Hood's three comments.

### a.      *Violation of policy by younger workers*

Plaintiffs asserts that two other RWCs in the Fort Dodge store, Garrett and Zehr, also violated the Friends and Family policy by working on their former husbands' accounts, but were not fired.   This assertion fails to generate genuine issues of material fact as to pretext for a number of reasons.   First, plaintiffs have not established that Garrett and Zehr violated USCC's Friends and Family policy.   Although plaintiffs have come forward with evidence that Garrett worked on her former husband's account, USCC does not consider former spouses to be family members under its Friends and Family policy because the legal relationship has been terminated by divorce.[6]   Moreover, during

---

[6]Plaintiffs have not offered any admissible evidence that Zehr worked on her ex-husband's account.  The only evidence plaintiffs have supplied to support their assertion that Zehr worked on her ex-husband's account is an untitled document, which appears to be transcribed investigation notes, which states:  "Julie indicated that she had accessed an ex-husband's account.  Plaintiffs' App'x at 210.  Because the court has not been supplied with any information about when this document was created or who, and under what circumstances, prepared this document, it does not constitute admissible evidence which the court can consider in ruling on defendants' motion.  *See Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (inadmissible evidence cannot be used to defeat summary judgment); *see also Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).  "Authentication is a 'condition
(continued...)

the investigation, after questioning Garrett about whether she "hung out" or did things together with her ex-husband, Duke told Garrett that her ex-husband was not a friend or family member. This conclusion is also supported by Garrett's deposition testimony that she does not consider her ex-husband to be her friend. Thus, plaintiffs have failed to demonstrate that either Garrett or Zehr violated USCC's Friends and Family policy.[7]

### b. Enforcement of post-April 19th violations

Plaintiffs also contend that USCC's decision to hold only those associates accountable for violations of the Friends and Family policy that occurred after April 19, 2005, evidences discrimination. Duke and Verstegen decided that associates should be held accountable for violations of the Friends and Family policy that occurred after the April 19, 2005, issue of Dynamically Speaking was distributed to employees because that event constituted the last clear communication from the company regarding the Friends and Family policy. Thus, Duke and Verstegen had a rational reason for selecting the April 19th date. Moreover, the selection of this date resulted in not just plaintiffs' terminations but the firing of Tiffany Sorenson, who was 35 years old, from the Fort Dodge store, as

---

[6](...continued)
precedent to admissibility' . . . We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment." *Orr,* 285 F.3d at 773 (quoting Federal Rule of Evidence 901(a)).

[7]Even if the court was to assume, *arguendo*, that Garrett's working on her ex-husband's account was a violation of USCC's Friends and Family, plaintiffs have not shown that she worked on her ex-husband's account after the April 19, 2005, edition of Dynamically Speaking was distributed to employees. Thus, plaintiffs have not demonstrated that Garrett is similarly situated to them.

well as the firing of three associates, who were all in their twenties or early thirties, from other USCC stores.[8]

The circumstances surrounding the investigation also belie any inference of discrimination. Shortly before the commencement of the investigation, each of the plaintiffs had received a positive performance evaluation from Hood. Moreover, in the case of Roberts, she could have been terminated for not meeting quota in July 2005, but was not terminated. Instead she was placed on a Performance Improvement Plan. The investigation into possible violations of USCC's Friends and Family policy was started only as a result of Schliske telling Hruska that the customer she was helping was Schliske's cousin. Duke started her investigation after being told by Hruska about Schliske's actions. During the investigation of Schiske's actions, Schliske informed Duke and Hruska that everyone at the Fort Dodge store, including Sanders and Roberts, had violated the policy. This caused the investigation to expand to all of the associates in the Fort Dodge store. While the investigation was ongoing, Jackie Knierim, another RWC in the Fort Dodge store, came forward and told Hruska that Sanders had run credit on one of her son's accounts after April 19, 2005. Once this information was confirmed, Duke and Verstegen decided to terminate Sanders. As part of her investigation, Duke conducted face to face interviews with all of the associates. During her interview with Roberts, Roberts told Duke that she had worked on her nephew's account. Based on this information, Duke and Verstegen decided to terminate her. The investigation further revealed a violation of the Friends and Family policy by Sorenson. Sorenson admitted during her interview with Duke that she had worked on her sister's account. As a result, Duke and Verstegen

_____

[8]Plaintiffs suggest that Sorenson's firing may have resulted from her being related to Roberts. The flaw in this argument is that plaintiffs have not offered any evidence that the decision-makers, Duke and Verstegen, knew of this relationship.

decided to also terminate her. During the course of the investigation, Ronette McColley, who was 45, admitted to Duke that she had accessed her brother-in-law's account. Duke's investigation revealed that McColley's brother-in-law's account had been closed for so many years that Duke could not even determine that McColley had accessed the account. McColley's employment was not terminated, even though she was roughly the same age as Schliske. Thus, in every case in which the investigation revealed a violation of the Friends and Family policy which occurred after April 19, 2005, the result was the same.

Plaintiff also directs the court to evidence that a more thorough investigation would have revealed other violations of the Friends and Family policy by other associates in the Fort Dodge office.[9] Evidence of a poorly conducted investigation, standing alone, absent evidence that defendants acted in bad faith, failed to follow their ordinary disciplinary procedures or treated other employees differently-proof that is totally absent here-cannot show pretext or defeat a summary judgment motion. *See Roeben*, 545 F.3d at 643 (holding that "[e]ven if [plaintiff] could show that the [employer's] investigation was poorly conducted or that its decision was impetuous, that alone would not allow him to survive summary judgment.")(citing *Hanebrink v. Brown Shoe Co.,* 110 F.3d 644, 646 (8th Cir. 1997)); *Jordan v. Olsten Corp.,* 111 F. Supp. 2d 227, 236 (W.D.N.Y.2000) (holding that employer was entitled to summary judgment even if it "conducted a shoddy

---

[9]Among this evidence are photographs of computer screens and transcripts of what appear to be administrative appeals hearings. Plaintiffs have again failed to provide the court with any information about when these photographs were taken, who took them, and under what circumstances. Similarly, the transcripts do not indicate when they were prepared, who prepared them, or a certificate from the preparer. Thus, these photographs and transcripts do not constitute admissible evidence which the court can consider in ruling on defendants' motion. *See Brooks,* 425 F.3d at 1111*; Orr ,* 285 F.3d at 773; *Raskin v. Wyatt Co.,* 125 F.3d at 66.

investigation" and "subsequently made a poorly informed decision to fire" plaintiff, so long as there was no evidence that "it was . . . discriminatory animus that motivated" the decision to conduct the investigation and terminate plaintiff's employment).

### c.    *Hood's comments*

Plaintiffs further point to three statements made by Hood as demonstrating age-discriminatory animus on the part of defendants. The first of these statements, made in reference to different preferences among employees for the temperature inside the store, was, "We shouldn't have to suffer for the old ones in here", or "Just because you older ladies are hot, don't [sic] mean that us younger people have to suffer." On another occasion, Sanders heard Hood comment that the Fort Dodge store's full-time staff was made up entirely of women and then state, "We need a young black man in here." On another occasion, Sanders heard Hood state that "Change is good. No one needs to stay around here all the time." When Hood made these statements is not disclosed in the summary judgment record.

The court finds these comments are insufficient to generate a genuine issue of material fact on the issue of pretext. These comments do not implicate the sort of stereotypes that the ADEA was designed to address-stereotypes that "productivity and competence decline with old age." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611 (1993). Nor are these comments "the kind of fact which would cause a reasonable trier of fact to raise an eyebrow, thus providing additional threads of evidence that are relevant to the jury." *See Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922-23 (8th Cir. 2000) (quoting *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 610 (8th Cir. 1997) (citations and quotations omitted)). The Eighth Circuit Court of Appeals has instructed that:

> [N]ot every prejudiced remark made at work supports an
> inference of illegal employment discrimination. We have

carefully distinguished between comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.

*Rivers-Frison v. Southeast Mo. Community Treatment Ctr.,* 133 F.3d 616, 619 (8th Cir. 1998) (internal citations omitted).

Moreover, plaintiffs have not established that Hood had any role in the decisionmaking process at issue in this case. The Eighth Circuit Court of Appeals has held that "'*some* causal relationship is necessary to demonstrate the significance of non-contemporaneous statements, or statements made by persons other than the relevant decision-maker, to the resolution of the ultimate issue of intentional discrimination.'" *Kohrt*, 364 F.3d at 898 (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 779 (8th Cir. 1995)); *see Richards v. Farner-Bocken Co.*, 145 F. Supp. 2d 978, 995-96 (N.D. Iowa 2001) (holding that ageist comments by co-workers were merely "'stray remarks' that, while indicating an age-discriminatory animus *on the part of those employees*, under the circumstances of th[e] case, [were] of no probative value as to [the employer's] decision-making process."). In this instance, there is no evidence that Hood's comments were made contemporaneous with plaintiffs' firings, nor is there any indication in the record that Hood played any role in determining that plaintiffs should be terminated, thus, the cat's paw theory of subordinate liability does not income into play, *see Coe v. Northern Pipe Prods., Inc.*, 589 F. Supp.2d 1055, 1087-88 (N.D. Iowa 2008), therefore, these remarks are categorized as 'stray remarks,' which, *standing alone,* would not support an inference of pretext. *See Fischer*, 225 F.3d at 922.

In summary, for the reasons discussed above, the court finds that plaintiffs have failed to carry their burden of showing a genuine issue of material fact with regard to pretext. Therefore, summary judgment is also appropriate on this ground.[10]

## D. Constitutionality Of Summary Judgment

Finally, plaintiffs argue that the court should deny defendants' Motion for Summary Judgment because the granting of summary judgment is unconstitutional violation of the Seventh Amendment to the United States Constitution. Defendants respond that plaintiffs argument is foreclosed by binding precedent from the Eighth Circuit Court of Appeals holding that summary judgment does not violate the Seventh Amendment. *Harris v. Interstate Brands Corp.,* 348 F.3d 761, 762 (8th Cir. 2003). Specifically, in *Harris,* the court of appeals observed:

> A grant of summary judgment does in itself not violate the Seventh Amendment. Summary judgment is proper when no genuine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A grant of summary judgment does not violate the Seventh Amendment right to a jury trial. This right exists only with respect to disputed issues of fact. *Fidelity & Deposit Co. v. United States,* 187 U.S. 315, 319-20, 23 S. Ct. 120, 47 L.Ed. 194 (1902). Actions for damages caused by employment discrimination, like other actions at law, are, in general, triable as of right by jury; but there is nothing special about employment-discrimination cases that would exempt them from

---

[10]Because the court has granted summary judgment on the merits of plaintiffs' age discrimination claims, the court need not address defendants' argument that they are entitled to summary judgment against plaintiff Schliske on the grounds that her claims are barred under the doctrine of judicial estoppel for her failure to disclose her claims against them in her bankruptcy case.

> normal procedural controls like motions for directed verdict or
> for summary judgment.

*Id.*

This court is without authority to replace existing circuit law with its own view. *See BPS Guard Servs. v. NLRB,* 942 F.2d 519, 524 (8th Cir. 1991) (noting that court of appeals's holdings on issues bind all district courts in the circuit and district courts must follow those holdings until reversed by the Eighth Circuit en banc or the United States Supreme Court). Accordingly, the court will follow the Eighth Circuit Court of Appeals's holding in *Harris* on this issue and conclude that the granting of summary judgment does not violate plaintiffs' Seventh Amendment right to a jury trial. *See Harris*, 348 F.3d at 762; *see also Calvi v. Knox County*, 470 F.3d 422, 427 (1st Cir. 2006) (rejecting plaintiff's contention that summary judgment is an unconstitutional abridgement of her Seventh Amendment right to trial by jury).

## III. CONCLUSION

For the reasons stated above, defendants' Motion for Summary Judgment is **granted**. The court concludes that plaintiffs have failed to make out a *prima facie* case of age discrimination under the ADEA and the ICRA, and have not generated a genuine issue of material fact as to pretext.

**IT IS SO ORDERED.**

**DATED** this 17th day of July, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA